UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                                 :
EDWARD GALLAGHER                 :
                                 :
                                 :
v.                               :   CIV. NO. 07CV332 (HBF)
                                 :
CRETE CARRIER CORP. and          :
GARY MATLOCK                     :
```

RULING AND ORDER

Pending before the Court are plaintiff Edward Gallagher's Motions to Set Aside the Jury Verdict **[doc. #74]** and for a New Trial **[doc. #75]**. Following a jury trial on November 4-6, 2008, a jury returned a verdict in favor of defendants Crete Carrier Corporation and Gary Matlock on Mr. Gallagher's claims for damages arising out of a December 4, 2006, motor vehicle accident. Defendants admitted liability for the accident. A jury trial was held to determine what damages, if any, would fairly compensate plaintiff for injuries suffered in the accident. The jury found that plaintiff failed to prove that defendants' negligence was the proximate cause of his injuries [doc. #70 at 1]. The Court entered Judgment [doc. #72] on November 7, 2008.

Plaintiff asks the Court to set aside the jury's verdict and grant a new trial under Rule 59(a)(1)(a) of the Federal Rules of Civil Procedure.[1] The bases for Mr. Gallagher's motion are that:

---

[1]Rule 59(a)(1)(A), "New Trial; Altering or Amending a Judgment" states, "(a) In General. (1) Grounds for New Trial. The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows: (A) after a jury trial, for

1

(1) the jury verdict was against the overwhelming weight of the evidence[2]; and (2) admission of certain evidence and exclusion of other evidence was so prejudicial as to confuse the jury and result in a miscarriage of justice.

STANDARD

"In ruling on a Rule 59 motion, a court makes the same type of inquiry as on a motion for judgment as a matter of law, but imposes a less stringent standard." Palma v. Pharmedica Commc'ns, Inc., No. 3:00CV1128(HBF), 2003 WL 22750547, at *14 (D. Conn. Sept. 30, 2003) (citing Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir. 1987) and Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 132 (2d Cir. 1986)). "A district court should grant a new trial motion if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998) (quotation marks omitted); see also Katara, 835 F.2d at 970; Martin v. Westport, No. 3:02CV1395(MRK), 2005 WL 39138, at *1 (D. Conn. Jan. 4, 2005).

Absent a showing of clear error or manifest

---

any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).

[2]In his Rule 59 motion, plaintiff does not claim that any error occurred in the conduct of the trial or that the Court's instructions to the jury were erroneous in any respect. Rather, plaintiff asserts that the jury's verdict was against the weight of the evidence and therefore the verdict against him represents a serious miscarriage of justice.

> injustice, it will generally be appropriate
> to deny relief pursuant to Rule 59 since
> litigants should neither be required nor
> without good cause permitted to relitigate
> already-decided matters. In short, "Rule 59
> is not a vehicle for relitigating old issues,
> presenting the case under new theories,
> securing a rehearing on the merits, or
> otherwise taking a 'second bite at the
> apple.'"

Svege v. Mercedes-Benz Credit Corp., No. 3:01CV 1771(MRK), 2004
WL 2377485, *3 (D. Conn. Sept. 28, 2004) (citations omitted)
(quoting Sequa Corp. v. GBJ Corp., 159 F.3d 136, 144 (2d Cir.
1988)); see also Lorusso v. Borer, No. 3:03CV504(MRK), 2006 WL
473729, at *15 (D. Conn. Feb. 28, 2006).  Rule 59(a) "has a less
stringent standard than Rule 50 in two significant respects: (1)
a new trial under Rule 59(a) 'may be granted even if there is
substantial evidence supporting the jury's verdict,' and (2) 'a
trial judge is free to weigh the evidence himself, and need not
view it in the light most favorable to the verdict winner,'"
Manley v. AmBase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003)
(quoting DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124,
133-34 (2d Cir. 1998)).  "That being said, for a district court to
order a new trial under Rule 59(a), it must conclude that 'the
jury has reached a seriously erroneous result or . . . the
verdict is a miscarriage of justice,' i.e., it must view the
jury's verdict as 'against the weight of the evidence.'" Id. at
245 (quoting DLC Mgmt. Corp. 163 R.3d at 133 (internal citations
omitted)).

A "review of a district court's decision to grant a Rule

3

59(a) motion is deferential;" and will only be reversed for abuse of discretion." Id.  (citing <u>Amorgianos v. National R.R. Passenger Corp.</u>, 303 F.3d 256, 261 (2d Cir. 2002)). "A district court abuses its discretion when '(1) its decision rests on an error of law (such as the application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision-though not necessarily the product of a legal error or a clearly erroneous factual finding-cannot be located within the range of permissible decisions.'" <u>Id.</u> (quoting <u>Zervos v. Verizon N.Y., Inc.</u>, 252 F.3d 163, 169 (2d Cir. 2001) (footnotes omitted)).


<u>FACTS</u>

<u>Prior Accident</u>

Plaintiff testified that he was involved in an motor vehicle accident fifteen to twenty years prior to the trial and sustained low back injuries. He stated he was hit on the left side of the car. He treated with a chiropractor.  Plaintiff received compensation for his injuries. Plaintiff did not provide any treatment records to show the extent of those injuries. Nor did plaintiff inform his neurologist, Dr. Mintz, about the prior accident.

<u>Mental Health Treatment</u>

On September 14, 2006, plaintiff sought treatment for stress at Chase Clinic. Def. Ex. 503b.  The treatment record states that he presented with complaints of "high stress & feeling low,"

4

sleep disturbance, overeating, lack of interest in old hobbies,
short temper.  Id. He complained of stress associated with
family, job loss four years ago and losing his home. Id. "Feels
like a failure & thought about 'running off the cliff' but would
not act on it b/c he's a 'coward'. . . ." Id.  "General
Assessment: New pt. coming in w/depression w/SI [suicidal
ideation] w/o specific plans & no attempts. Will make appt . . .
to recommend group counseling & possible need for SSRI." Id.
Plaintiff weighed 289 pounds.  Id.

On November 14, 2006, plaintiff returned to Chase Clinic for
a follow-up appointment and for removal of a cyst. Def. Ex. 503c.
The treatment notes state in part, "He tried nothing to relieve
his stress except having self pity & having beer at home & cold
shower when temperamental.  Pt's motivated to change & wants to
be calmer & 'more mellow around children.' Still no change from
prior visit. Has not seen Dr. Papsun as suggested & did not show
for the appt b/c pt had to work (M-Sat). Pt has not gone for
blood work either b/c of work as well." Id.  A follow-up
appointment was recommended for group counseling and possible
need for SSRI." Id.  Plaintiff weighed 275.  Id.

Plaintiff did not tell his wife he was receiving mental
health treatment prior to the accident at issue in this case.

Accident: December 4, 2006

Following the motor vehicle accident at issue on December 4,
2006, plaintiff was transported by ambulance to Norwalk Hospital.
A DX Lumbar Spine 2 or 3V taken at the Norwalk Hospital Emergency

Room noted, "no fracture, dislocation or bony destruction is
seen. The intervertebral disc spaces are normal in width. There
are no defects in the neural arch."  Pl. Ex. 2C. Plaintiff
testified that blood tests indicated he had high blood sugar
levels and needed follow-up treatment for diabetes.  Mr.
Gallagher was released from the hospital after a few hours.[3]

Alliance Medical Group of Greater Waterbury Chase Clinic

     Plaintiff was seen at Alliance Medical Group of Greater
Waterbury Chase Clinic on December 6, 2006, two days after his
motor vehicle accident, complaining of "pain lower back/flanks."
Pl. Ex. 1.  On examination, the physician noted "mild to moderate
pain in the backward and right lateral range of motion.
Tenderness is noted in the right lower back. No CVA tenderness.
Muscle spasm is noted in the lower back. There is a palpable
lipoma just lateral to left lumbar spine."  Id. Dr. Holt provided
a note to plaintiff's employer, stating that Mr. Gallagher
"should avoid work-related activities for the next several days
(i.e. he can return to work 12/11 if he feels up to it.)"  Id.

     Plaintiff returned to work on December 12, 2006. Pl. Ex. 1.

     Plaintiff was seen again at Alliance Medical Group of
Greater Waterbury Chase Clinic on December 18, 2006. The

_____

     [3]Admitted into evidence was Norwalk Hospital's billing
record for emergency room services provided on the date of the
accident, December 4, 2006. Pl. Ex. 7. Plaintiff testified
briefly that he was treated and released. There was no further
testimony offered.  The jury could have concluded from this
record and the testimony that Mr. Gallagher had not injury caused
by the motor vehicle accident, which involved Mr. Gallagher's
truck being hit in the rear by another truck.

treatment records noted that Mr. Gallagher reported that he "returned to work and pain has continued. Lifted a hand cart and felt R hand side . . . no weakness, no referred pain down his leg. No difficulties urinating with BM. He is seeing a chiropractor which is helping. Before returned to work pain was improved. Has been using a heating pad which has helped as well." Def. Ex. 503d. Treatment notes of his back examination state, "No CVA tenderness. There is a palpable lipoma just lateral to left lumbar spine. No gait abnormalities. There is mild to moderate pain with backward and right lateral range of motion. Muscle spasm is noted in the right mid back.  Tenderness is noted in the right mid back." Id. Percocet was discontinued. Ibuprofen was prescribed 3x daily for 3 days, then to be taken on an as-needed basis. "Discussed not returning to work" and plaintiff was provided with a doctor's note.  Plaintiff's weight was recorded at 266 pounds.  Id.

Plaintiff returned to Alliance Medical Group of Greater Waterbury Chase Clinic for his third visit on December 27, 2006. The treatment notes indicate that he was still experiencing "lumbar strain . . . but pain is overall better." Pl. Ex. 1; Def. Ex. 503a.  The doctor noted that plaintiff "may respond better to a different NSAID and would likely be more comfortable at night on a very short course of muscle relaxants." Id.  Flexeril was prescribed for two weeks with no refills, noting "Narcotics are not indicated." Id. "Pt given letter for work stating he could go back on 1/2/07." Id.  Plaintiff's weight on December 27,

2006, was 265 pounds.  Id.

Plaintiff received a physician's note that he was able to return to work on Tuesday, January 2, 2007.  Pl. Ex. 1.

A phone message to Alliance Medical Group of Greater Waterbury Chase Clinic, dated May 8, 2007, stated that Mr. Gallagher's wife called requesting a refill on Percocet.  Pl. Ex. 1.  Plaintiff received a prescription for Vicodin from Dr. Mintz, a neurosurgeon, on May 11, 2007. Pl. Ex. 2.

Waterbury Family Chiropractic Center

Plaintiff treated twenty-seven times with Waterbury Family Chiropractic Center from December 13, 2006 to May 4, 2007. Pl. Ex. 6.  Plaintiff's Chiropractor, Matthew Kenney, did not testify at trial.

Dr. Abraham Mintz, Neurosurgeon

Plaintiff was first seen by Dr. Abraham Mintz, a neurosurgeon, on March 9, 2007. The intake form indicted left back pain greater, right neck. Pl. Ex. 2C.  The doctor noted that plaintiff tried to work but could not. Pl. Ex. 2C.

An MRI and CT scan were performed in April, 2007. Dr. Mintz testified that, "[t]he MRI of the cervical spine demonstrated a bulge between the fifth and sixth and the smaller one between four and five.  The lumbar spine had something that is called high intensity zone which means that the color of the disc is somewhat different in that tip, there is an area that is usually white, that means that a tear has occurred on the disc." He elected to treat plaintiff with conservative measures, physical

therapy and prescription pain medication, and he sent plaintiff to get injections of cortisone or steroids, one into his neck and one into his back, to try to decrease the inflammation and relieve his discomfort. In May, Dr. Mintz recommended epidural steroid injections but plaintiff reported in July that his insurance company had not approved the therapy. By July, Dr. Mintz recalled that plaintiff had returned to work "but found himself lifting objects up to 90 pounds which were worsening his condition. He felt that the pain was becoming incapacitating and he was requiring more Vicodin which is the pain medication for relief of pain."

Plaintiff visited Dr. Mintz on nine occasions between March 9 and August 29, 2007. Pl. Ex. 2A. Dr. Mintz prescribed Vicodan on May 11, June 25, July 10 and 23 and August 3 and 16, 2007. Id. On August 16, 2007, the notes state, "last one-tell him." Pl. Ex. 2B. On September 12, 2007, Mrs. Gallagher requested a refill for Vicodin, and "No more Vicodin per Dr. M" was noted on the phone message. Pl. Ex. 2B.

Dr. Mintz did not see plaintiff again until May 2008. Plaintiff treated with Dr. Mintz four times between May 5 and September 18, 2008. Pl. Ex. 2A. Plaintiff reported he was not doing well and "standing on his feet was terrible." Plaintiff reported "that his back pain increased with any kind of physical activity such as standing, lifting, bending or stretching backwards. He was also having neck pain but it wasn't as intense as his low back." Id.

Upon review of the X-Ray in May 2008, Dr. Mintz noted a right side pars defect.  "I told [plaintiff] that I believe that his symptoms had been present all along. I felt that his symptoms were what we call mechanical or discogenic in nature . . . ." Dr. Mintz also told plaintiff he needed to make a significant effort to lose weight.

Plaintiff was sent for another MRI and CT Scan and returned to Dr. Mintz in June 2008, when the doctor noted a right side pars defect and a right sided facet defect. He described a subtle defect of the pars at L5 and on S1 on the right, next to the facet, that he thought was abnormal, a combination of a pars problem and a facet problem right next to each other on the right side in the low back. On cross examination, Dr. Mintz stated this was the first time he documented complaints of right-sided pain.

In July 2008, plaintiff returned to Dr. Mintz, reporting that his injection with Dr. Anand provided him with significant relief for one week and then he was slowly returning to his preinjection condition with a lot of pain. Dr. Mintz recommended a second injection and a follow-up appointment in two months.

At trial, Dr. Mintz was asked for his opinion, based upon reasonable medical certainty, whether plaintiff's condition was caused by the December 4, 2006, motor vehicle collision. He replied,

> My opinion is that he had a preexisting
> condition that was asymptomatic. He had a
> condition as I stated, that is, a pars defect
> and a problem with the facet were present,
> but the accident made that condition-it
> brought on the symptoms of the-of that

10

condition which is a common occurrence in my
practice and experience.

Dr. Mintz offered an opinion regarding future medical
treatment. He recommended a laminectomy and fusion whereby "the
pars and the facet abnormalities are removed and screws are
applied into the spine to basically support it and stop it from
moving and to share the load. . . ."  Dr. Mintz estimated that
the surgery would cost around $70,000.  Without surgery, Dr.
Mintz opined that plaintiff had reached his maximum medical
improvement.

Dr. Mintz opined that plaintiff's disability rating was
between 10 and 15 percent. Even if back surgery were successful,
plaintiff would have less motion after the surgery and his
disability rating would not improve.

On September 4, 2008, Dr. Mintz advised that Mr. Gallagher
was able to return to work with a weight restriction of 70
pounds.  Pl. 2C.

On cross examination, Dr. Mintz admitted that the first time
he examined plaintiff, three months after the accident, he did
not have right-sided pain or low back pain and his complaint was
on the left side.  On initial examination, Dr. Mintz noted left
sided weakness with straight leg raising and no problem on the
right with left side back pain greater. He also noted decreased
pinprick sensation over the lateral aspect of the left calf.  Dr.
Mintz testified that he had not reviewed the emergency department
treatment records from Norwalk Hospital on the day of the

11

accident or the follow-up treatment plaintiff received from
Alliance Medical Group.  Dr. Mintz's March 2007 review of Norwalk
Hospital's December 4, 2006, X-Rays was negative; he saw no
dislocation, no bony destruction, normal intervertebral disc
space and no defects to the neural arch.  Dr. Mintz was unaware
that plaintiff suffered any injury attributed to lifting upon his
return to work the week after the motor vehicle accident,
resulting in right-sided back pain.  Pl. Ex. 1.  He testified
that the right side is where plaintiff has the anatomical
problems.

Dr. Mintz also testified that he was unaware that plaintiff
was involved in a motor vehicle accident prior to December 4,
2006, for which he had recovered compensation for an injury to
his back.

Dr. Mintz testified that in April 2007, plaintiff complained
of stiffness after a flood at his home required him to lift and
carry.  In July 2007, Dr. Mintz noted that plaintiff returned to
work and was lifting 90 pound objects and it was causing him
problems. Dr. Mintz testified that he received several requests
for Vicodin refills from plaintiff or his wife. Dr. Mintz
discontinued all refills in August 2007.   Plaintiff did not
return for treatment for another ten months, or until May 2008.


Dr. Edward M. Staub, Orthopedist

At trial, defendants offered Dr. Staub as an expert in the
field of orthopedic surgery.  Dr. Staub examined Mr. Gallagher on

two occasions and reviewed plaintiff's medical records, X-rays, MRI's, and Dr. Mintz's report. Dr. Staub testified that plaintiff's MRI showed two disks bulging in the lumbar region. He also observed pre-existing degenerative changes, "which I don't think were from the accident."  Upon a recent examination of plaintiff, the doctor agreed with an impairment rating "in the range of eight percent."

Dr. Staub was asked, "the bulging disk you spoke of, do you have an opinion within a reasonable degree of medical certainty as to whether those bulging disks are from this accident?" He answered, "[i]ts really impossible to tell without an MRI that was performed before the accident, which did not occur. There was no MRI before the accident. So without that kind of study, you can't be certain.  But I was, because of the nature of the accident . . . willing to agree that the impairment rating that Dr. Kenny [plaintiff's chiropractor] recommended was reasonable, and I thought it was in the range of eight percent."  Dr. Staub, opined that back surgery was "not strongly indicated." "[M]y impression is that he is having some difficulties, he's having trouble, but I did not get the impression that he's on the verge of having back surgery."

Dr. Staub added that most individuals with pars defect or bulging disk do not require surgery and "[m]ost adults in this country have bulging disks, adults in their 30's, 40's, 50's." "We've done MRI's on random people without any back pain, and most of those people have disk bulges." "A lot of people have

13

pars defects.  It's usually asymptomatic and an incidental
finding."

Asked whether he had an opinion "within a reasonable degree
of medical certainty as to what, if any, course Mr. Gallagher
could take that would improve his condition and perhaps reduce
his complaints," Dr. Staub replied, "He's overweight. I believe
he said he weighed 270 pounds, it that correct? 260. . . . He has
a protruding belly . . . if someone like that with back pain
could get his weight down to 190, I think his back would feel
much better."

Dr. Staub examined Gallagher in August 2007 and again on
October 2008. He noted normal painless motion in plaintiff's
neck, full motion in his upper extremities and neurological
testing was normal. "[B]asically, the findings in his lower back,
lower extremities, were basically normal, too, although
discomfort is more accurate. And he was overweight.  That was a
major finding." The doctor further observed that plaintiff walked
normally and had a normal range of motion in his spine with no
muscle spasms, with straight leg raising to ninety degrees with
no discomfort, which is a normal finding.

In summary, Dr. Staub testified, "I think that he does have
an impairment from the accident.  I think it's in the range of
eight percent. But he does have other problems that were not
caused by the accident, his pre-existing degeneration, which
wasn't severe, but it was there, and his weight, which I think is
a substantial factor. If he loses weight, you know, who knows?  I

14

think he'll get better, but I could be wrong."

    With regard to surgery, Dr. Staub testified

        what Dr. Mintz is recommending is a major
        operation to not only take the disks out and
        decompress his spine, but to fuse his spine
        from I think L4 to the sacrum with metal and
        instrumentation, which means screws and
        plates and cages. And that is precisely the
        type of operation that I think does not carry
        a very high success rate.

        Now, if Mr. Gallagher goes ahead with that
        specific operation, then it is not because he
        has a disk bulge or two, it's because he has
        degenerative disk disease and a degenerative
        condition, including possibly a pars defect,
        which even Dr. Mintz feels is pre-existing.

        So that scope of a big operation with a
        fusion and instrumentation is being done not
        because Mr. Gallagher has a disk or two,
        which was a result of the injury with the
        truck, but because of a pre-existing
        degenerative condition.

        . . . .

        the reason one does a fusion, as Dr. Mintz is
        recommending, is because of a degenerative
        spinal condition. And that was not from the
        accident. That was pre-existing.


    Dr. Staub testified that he knew plaintiff was in an

accident twenty years ago and he knew plaintiff was involved in a

legal action but he was not provided with any reports, documents

or medical records regarding the accident and he did not know if

plaintiff had a disability rating assigned for his injuries.


Dr. Lewis M. Bader, Radiologist

    Dr. Lewis M. Bader, a radiologist, was called to testify by

defendants.  Dr. Bader reviewed plaintiff's x-ray, CT scans and

MRIs and concluded that none of the abnormalities on the
diagnostic studies considered were related to the December 2006
motor vehicle accident.  He stated that the "minor" developmental
anomaly present on plaintiff's lumbar spine in the December 4,
2006, x-ray is a common finding.  In the CT Scan from May 8,
2008, he noted a few abnormalities to both the bone and disc and
a pars defect.  Neither is related to specific trauma.  He
explained that disk bulging is  result of reduced elasticity. The
pars is part of the bony ring of the spine. He explained that
sometimes it develops and weakens and over time it gives out.
These defects develop in early adolescence but do not become
symptomatic until the 20's or 30's.

Dr. Bader further testified that he reviewed the MRIs of the
lumbar spine taken in March 2007 and May 2008. He testified that
the May 2008 MRI similarly shows bulging discs, a small
herniation. He explained that small herniations are very common
and are seen frequently in people not looking for them. He
considered this a "incidental finding". . .something that has no
relationship to what we are looking for."  Comparing the 2008 MRI
with the 2007 MRI, he found it significant that the 2007 scan did
not show a herniation, whereas the 2008 MRI did.  This indicated
either progressive degeneration or an intervening event, neither
of which is attributable to the accident at issue.

Employment History Before All Metals Industries

Plaintiff's employment with G & R Manufacturing Carlson

16

Holdings, Incorporated ("Carlson Holdings"), was terminated on October 19, 2001. Def. Ex. 510b.  He was employed by Carlson Holdings from September 24, 2001 to October 19, 2001.  The employer's stated reason for unemployment was "job fit."  Id.

Plaintiff testified that he was collecting unemployment benefits from employment at Prime Screw while employed with Carlson Holdings. The Connecticut Department of Labor found that, "the evidence support[ed] a finding that [he] knowingly made a false statement or representation or knowingly failed to disclose a material fact in order to obtain or increase benefits." Def. Ex. 522b.  Plaintiff was required to repay the unemployment benefits and a six week administrative penalty forfeiting benefits was assessed against him.  Id.

On a job application submitted to Northrop Grumman, on October 30, 2001, plaintiff omitted his employment with Carlson Holdings. Def. Ex. 511a.

Plaintiff's employment with Litton Veam/ITT Defense & Electronics was terminated on April 10, 2003, for excessive absenteeism. Def. Ex. 511b.

Plaintiff's employment with Ward Leonard was terminated on September 17, 2004, for excessive absences and tardiness. Def. Ex. 512.

On a job application submitted to Watkins Motor Lines, Inc., on  November 10, 2004, plaintiff did not state the real reason for the termination of his employment with Ward Leonard, representing that the job was temporary; and he did not list his

17

previous employment with Carlson Holdings and Litton Veam/ITT Defense.  Def. Ex. 513a.  Plaintiff certified that, "all entries [on the application were] true and complete to the best of [his] knowledge and recollection."  Id.

On January 25, 2005, plaintiff's employment with MCT [Watkins] was terminated for attendance issues. Def. Ex. 513b. Plaintiff was employed from November 9, 2004 to January 25, 2005. Id.

On a job application submitted to Manpower on March 7, 2005, plaintiff did not state the real reason for the termination of his employment with Watkins and Ward Leonard and he did not list his prior employment with Carlson Holdings and ITT Defense. Def. Ex. 514. Plaintiff admitted on the stand that he lied about his employment history.

Employment with All Metals Industries

Mr. Gallagher testified that he was employed as a truck driver for All Metals at the time of the accident, earning $14.00 per hour. Plaintiff submitted to a drug test on January 12, 2007, pursuant to All Metal's company policy, Def. Ex. 520a, which was positive for marijuana use.  Def. Ex. 520b. Plaintiff's employment with All Metals was terminated, effective January 2007, because he failed the drug test.

Employment History After All Metals Industries

On a job application submitted to Talent Tree on August 6, 2007, Mr. Gallagher represented that he was immediately available to work 40 plus hours a week and was "able, with or without a

18

reasonable accommodation, to perform the essential functions of the job for which [he] applied." Def. Ex. 516. Plaintiff answered "no" to the question, "[h]ave you ever initiated an act of violence in the workplace or been disciplined for violated a company's safety or security rules?" Id.

On an undated application submitted to Kelly Services, plaintiff did not state the real reasons thathis employment at All Metals and Ward Leonard was terminated.  Def. Ex. 517.

Plaintiff was asked to list his employment history and reasons for termination of employment in discovery interrogatories. Def. Ex. 522a. Plaintiff did not list all of his employment history and did not state the reasons for the termination of employment.  Id.

Testimony & Evidence Regarding Damages

Plaintiff testified that he earned $14.00 an hour and averaged a ten hour work-day, or $140 per day, when employed by All Metals Industries. After the motor vehicle accident, from December 4, 2006 through January 2, 2007, plaintiff did not work the week of December 4-8, returned to work the week of December 11-14, and was out of work during the weeks of December 18-22 and 25-29, 2006.  Plaintiff testified that he was seeking lost wages totaling $2,100, or $140 per day for fifteen days, to compensate him for income lost due to injuries sustained from the accident.

Plaintiff submitted medical bills from Alliance Medical Group, Pl. Ex. 1; Dr. Mintz, Pl. Ex. 2A; Advanced Radiology Consultants, LLC, Pl. Ex. 4; CT Pain and Wellness Center, LLC,

Pl. Ex. 5; Waterbury Family Chiropractic Center, Pl. Ex. 6;
Norwalk Hospital, Pl. Ex. 7; Norwalk Radiology Consultants, Pl.
Ex. 8; and Greater Waterbury Imaging Ctr, LLP, Pl. Ex. 9.  These
bills were offered into evidence without supporting testimony or
further explanation by plaintiff or any other witness.

DISCUSSION

1.   Jury's Verdict

    Plaintiff first argues that the jury verdict was against the
overwhelming weight of the evidence.  After considering the
evidence, the jury found that plaintiff did not prove by a
preponderance of the evidence that defendants' negligence was a
proximate cause of any injury that he suffered.  Plaintiff argues
that the jury rejected "the overwhelming evidence of causation at
trial" and "its verdict is against the weight of the evidence."

    Having carefully reviewed Mr. Gallagher's arguments and the
evidence, the Court is not convinced that the jury's verdict was
erroneous based on the evidence before it or that the trial
represented a miscarriage of justice. United States v. Landau,
155 F.3d at 104. It is apparent to the Court that Mr. Gallagher
believes in his claims and also believes firmly that the jury had
no basis to reject them. But the fact that Mr. Gallagher
sincerely believes that the jury had no basis to reject his
claims is not sufficient reason to grant a new trial under Rule
59.

The jury could have reasonably found from the medical evidence and testimony that plaintiff did not prove causation by a preponderance of the evidence.  Plaintiff argues that the jury improperly ignored the testimony of "six of eight witnesses." But it is not for Mr. Gallagher to determine the credibility of witnesses. That task is the exclusive province of the jury and the court must give "deference to all credibility determinations and reasonable inferences of the jury." <u>Galdieri-Ambrosini v. National Realty & Dev. Corp.</u>, 136 F.3d 276 (2d Cir. 1998).

Each side presented the jury with evidence in support of its respective position. The jurors listened carefully to the evidence presented, the testimony of the witnesses, the arguments of counsel and the instructions from the Court. They then assessed credibility of witnesses and answered the question on the verdict form regarding causation, resolving the issue against Mr. Gallagher.

In making these credibility determinations, the jury was confronted with a plaintiff who admitted that he had lied in the past about his employment history and the reasons for his termination from various jobs.  He had failed to tell his wife about his pre-existing emotional distress, or his doctors about his pre-existing injuries or the injury that may have occurred after his return to work from the auto accident.

The burden was on the plaintiff to prove the nature and extent of the injuries resulting from the auto accident by a preponderance of the evidence. The jury was entitled to

disbelieve his testimony. It was entitled to discount the testimony of his doctor, if the jury found that the doctor's opinion was not based on complete information, which the jury could have reasonably concluded after cross-examination of Dr. Mintz.

The Court believes that the jurors followed the Court's instructions and made reasonable credibility determinations based on the evidence before them.  There is no basis under Rule 59 to set aside the jury's hard work and their considered judgment of the facts presented to them.

Accordingly, plaintiff's motion is **DENIED** on this basis.


2.   Evidentiary Rulings

Mr. Gallagher claims error in the Court's evidentiary rulings denying his motion in limine and excluding certain medical treatment records.  Upon reconsideration, the Court adheres to its evidentiary rulings at trial.

At trial, plaintiff offered treatment records without testimony pursuant to Conn. Gen. Stat. §52-174.[4]  It is

---

[4]Conn. Gen. Stat. § 52-174(b) states:

> (b) In all actions for the recovery of damages for personal injuries or death, pending on October 1, 1977, or brought thereafter, . . . and in all other civil actions pending on October 1, 2001, or brought thereafter, any party offering in evidence a signed report and bill for treatment of any treating physician, dentist, chiropractor, naturopath, physical therapist, podiatrist, psychologist, emergency medical

undisputed that plaintiff wanted to rely on the treating records
and narrative reports to prove diagnosis, permanency, causation
and prognosis. Plaintiff chose to forego testimony by his first
three medical providers, Norwalk Hospital, Alliance Medical Group
Chase Clinic, and Waterbury Family Chiropractors; his
radiologists, Advanced Radiology and Norwalk Radiology; and his
pain management doctor, Dr. Anand.  Plaintiff limited his medical
evidence to Dr. Mintz's deposition testimony but chose not to
provide Dr. Mintz with the records of plaintiff's other medical
providers. Thus, Dr. Mintz was unable to consider this evidence
and provide an informed opinion.  At trial, defendants objected

technician, optometrist, physician assistant
or advanced practice registered nurse may
have the report and bill admitted into
evidence as a business entry and it shall be
presumed that the signature on the report is
that of the treating physician, dentist,
chiropractor, naturopath, physical therapist,
podiatrist, psychologist, emergency medical
technician, optometrist, physician assistant
or advanced practice registered nurse and
that the report and bill were made in the
ordinary course of business. The use of any
such report or bill in lieu of the testimony
of such treating physician, dentist,
chiropractor, naturopath, physical therapist,
podiatrist, psychologist, emergency medical
technician, optometrist, physician assistant
or advanced practice registered nurse shall
not give rise to any adverse inference
concerning the testimony or lack of testimony
of such treating physician, dentist,
chiropractor, naturopath, physical therapist,
podiatrist, psychologist, emergency medical
technician, optometrist, physician assistant
or advanced practice registered nurse.

to the admission of any records from other healthcare providers that were not marked at Dr. Mintz's deposition and were not addressed by Dr. Mintz.

Plaintiff proffered medical documents without benefit of testimony from the provider and without any opportunity for defendants to cross examine the declarant. Defendants did not agree to the admission of the treatment documents that plaintiff sought to admit in bulk at the end of his case.

Section 52-174 of the Connecticut General Statutes does not relieve the offering party of the obligation to properly disclose its evidence in a timely manner and does not permit a party to admit a stack of medical records in a vacuum without further explanation from a medical provider or witness and without benefit of cross-examination.  Fed. R. Evid. 403. This evidence was properly excluded under Fed. R. Evid. 403.

Plaintiff also argues that the Court improperly admitted evidence of his treatment for depression and insomnia prior to the motor vehicle accident since he was not claiming emotional distress damages or future lost wages or lost earning capacity damages.  At trial, plaintiff's wife, Doreen Gallagher, testified about the impact the accident had on the quality of her husband's life. She discussed his post-accident sleep disturbance, mood change, and the impact his injuries had on their marriage and family. Admission of the records from September and November 2006, on cross examination, to show that plaintiff sought treatment for depression, moods, and sleep disturbance prior to

24

the accident, was proper.

Plaintiff also contends it was error for the Court to permit cross examination on his past drug use. However, plaintiff testified on direct examination that the marijuana use that led to the termination of his employment from All Metals was due to despondency after the December 6 accident because he did not have money for Christmas. It was not improper on cross examination to permit defendants to inquire about plaintiff's drug use prior to the accident.

Similarly, plaintiff objects to the admission of numerous misstatements on job applications as highly prejudicial. However, it was not improper on cross examination to permit defendants to inquire about plaintiff's false representations regarding his employment history to prospective employers and in pre-trial discovery. Nor was it improper to inquire about the finding by the  Connecticut Department of Labor that plaintiff knowingly made a false statement in order to obtain or increase benefits. Def. Ex. 522b.

Accordingly, plaintiff's motion on this basis is also **DENIED**.

**CONCLUSION**

For the foregoing reasons, plaintiff Edward Gallagher's Motions to Set Aside the Jury Verdict **[doc. #74]** and for a New Trial **[doc. #75],** are **DENIED.**

Defendants will renew their Bill of Costs within fourteen (14) days of this ruling.

This is not a recommended ruling.  The parties consented to proceed before a United States Magistrate Judge [Doc. #35] on May 7, 2008, with appeal to the Court of Appeals.

ENTERED at Bridgeport this 10th day of September 2009.

```
_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE
```